**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **KAREN PADGETT BROWN,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 14-00343-KD-C** |
| | ) | |
| **MOBILE COUNTY COMMISSIONERS,** | ) | |
| ***et al.*,** | ) | |
| **Defendants.** | ) | |

**ORDER**

This matter is before the Court on Defendant's Motion for Summary Judgment solely on Plaintiff's discriminatory and retaliatory termination claim (Docs. 12, 13) and Defendant's Reply (Doc. 17).   While provided with the opportunity to do so, Plaintiff did not respond to Defendant's motion for summary judgment.

**I.    Background**

This cause came before the Court on Defendant Mobile County Commissioners' motion for summary judgment on Plaintiff Karen Brown's discriminatory/retaliatory termination claim made under *Title VII of the Civil Rights Act of 1964*.   The Mobile County Commissioners seek summary judgment arguing Brown was discharged due to her dishonest misconduct, not because of her race, sex, or alleged protected activity.   The Mobile County Commissioners assert an investigation of Brown's conduct provided ample basis for the decision-makers to conclude Brown misled vendors, dishonestly misused the County's purchase order system for personal aims in violation of multiple purchasing policies, did so even after a previous warning for similar misconduct, attempted to cover up her misconduct, and lied to her department manager when she was caught.  After due consideration of the pleadings, briefs, and evidentiary materials submitted

1

by the parties, the Court finds that there is no genuine issue of material fact, and The Mobile County Commissioners are entitled to judgment on Brown's termination claim as a matter of law.   The Court enters the following Findings of Fact and Conclusions of Law and Order granting summary judgment.

## II.   Findings of Fact[1]

### A.   "Chain of Command" and "Cast of Characters" Background Information

The Mobile County Commission is the elected government of Mobile County, Alabama. Merceria Ludgood is County Commissioner for District One. Connie Hudson is County Commissioner for District Two.  Jerry Carl is County Commissioner for District Three. (Lawson

---

[1] At the summary judgment stage, the facts are taken in the light most favorable to the non-movant. Tipton v. Bergrohr GMBH–Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992). The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Priester v. City of Riviera Beach, 208 F.3d 919, 925 n. 3 (11th Cir. 2000).  Additionally, Plaintiff did not file a response to the motion for summary judgment. Local Rule 7.2(b) for the Southern District of Alabama requires a party who responds to a Rule 56 motion to specify the disputed facts, if any, and the Rule explains that failure to do so will be interpreted as an admission that there is no material factual dispute:

> Within thirty (30) days…[of the filing of a motion for summary judgment] or as may be otherwise ordered, the party or parties in opposition shall file a brief in opposition thereto, and, if it is contended that there are material factual disputes, shall point out the disputed facts appropriately referenced to the supporting document or documents filed in the action.  Failure to do so will be considered an admission that no material factual dispute exists; provided, that nothing in this rule shall be construed to require the non-movant to respond in actions where the movant has not borne its burden of establishing that there is no dispute as to any material fact.

S.D.ALA.L.R. 7.2(b).  Because Plaintiff failed to "point out the disputed facts," her "[f]ailure to do so will be considered an admission that no material factual dispute exists." Id. See Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1302–03 (11th Cir. 2009) (giving deference to interpretation of local rule which provides that if a "party responding to a summary judgment motion does not directly refute a material fact set forth in the movant's Statement of Material Facts with specific citations to evidence, or otherwise fails to state a valid objection to the material fact pursuant to Local Rule 56.1B(2), such fact is deemed admitted by the respondent[]"); Patton v. City of Hapeville, Ga., 162 Fed. Appx. 895, 896 (11th Cir.2006) ("We conclude from the record, however, that the district court properly held that the defendants' statement of undisputed facts filed with their motion for summary judgment were admitted when Patton failed to respond to the statement of facts in accordance with the Federal Rules of Civil Procedure and the Local Rules for the United States District Court for the Northern District of Georgia[]"). Moreover, Rule 56(e) of the Federal Rules of Civil Procedure provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required under Rule 56(c), the court may …  consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e).  The Court, having determined that Defendant's undisputed facts are deemed admitted, makes the following factual findings.

Decl. ¶2). The County has a Public Works-Engineering Department headed by Joe Ruffer, Director of Public Works / County Engineer. Ruffer reports directly to the County Commission. Public Works Superintendent Ted Lawson, Sr. reports to Ruffer and oversees the day-today operations of the Public Works side of the Department. (Lawson Decl. ¶2).

Brown worked as an Automotive Parts Buyer for the Public Works Department from November 2007 until her termination in November 2013. She worked at the Public Works facility located at 1150 Schillinger Road North, Mobile, Alabama 36608. This facility is colloquially referred to as "Camp 1" and includes the Public Works equipment maintenance parts department and primary vehicle and equipment maintenance garage.[2] (Lawson Decl. ¶3).

Fletcher Robinson is a Purchasing Manager in the Public Works Department who was Brown's primary direct supervisor from approximately January 2011 until her termination in November 2013. Raymond Shelly is a Garage Supervisor who was Brown's primary direct supervisor prior to Robinson's promotion. Robinson and Shelly report to Equipment Services Manager Robert Gordon, who in turn reports to Lawson. Lawson had promoted Robinson in late 2010 / early 2011 in the hope he would provide a "buffer" between Brown and Shelly who had clashed in the past. Shelly often had complaints about her work, and Brown disliked what she perceived as Shelly's overbearing supervisory style. (Lawson Decl. ¶4).

**B.**     **Plaintiff's Job Duties & Ethical Purchasing Responsibilities**

The Mobile County Public Works Department is responsible for supervision of the design and construction of any new publicly-funded projects within Mobile County, for issuing permits and inspecting all building construction on private property in the unincorporated portion of the County, and for issuing permits for construction to be performed by outside agencies or private

---

[2] "Camp 2" and "Camp 3" are small maintenance/repair facilities located in south and north Mobile County, respectively. Only a few mechanics and no parts buyers work at these locations. (Lawson Decl. ¶3)

contractors within a County road right-of-way. The Department is also responsible for maintaining County-owned buildings, an airport on Dauphin Island, several parks, a significant number of roads, drainage facilities associated with these roads, bridges, traffic control devices, a countywide trunked radio system, and environmental measures. The Department is also responsible for administering contracts approved by the County Commission, planning, mapping of all roads in the County, subdivision plan review, commercial site plan review, road and drainage improvements, and bridge construction and/or repair. (Lawson Decl. ¶4).

To carry out these various obligations, the County owns a large fleet of automobiles, equipment, and other vehicles assigned for use by the Public Works Department. To maintain the fleet, the County must regularly purchase automotive and construction equipment parts and supplies. As an Automotive Parts Buyer, Brown was directly responsible for purchasing parts for the vehicles and equipment of the road and bridge division of the Public Works Department. (Lawson Decl. ¶6) . Brown's job description[3] characterizes the "distinguishing features" of her job as follows:

> An employee in this class is responsible for the timely and economical purchase of parts and supplies, for assuring the proper quality of parts purchased, and for maintaining inventory control. Work is performed in accordance with well defined policies and procedures under the direct supervision of the Purchasing Agent, Garage Supervisor or other superior.

The job description further indicates some examples of the work to be done, including:

> Receives orders for parts and supplies from authorized personnel independently makes purchases of the normal and less complex requirements in accordance with best price and quality; prepares requisitions and bid forms; handles routine correspondence with vendors; performs a variety of related clerical work; interviews vendors and sales representatives by phone and in person; submits invoices for payment after checking for proper conformance to order; …

---

[3] (Lawson Decl. *Exhibit 1*)

4

The job description also states as one of the "essential requirements of the work" that Brown must have "good knowledge of the laws and ordinances governing governmental purchasing".

Mobile County's General Purchasing Policies were one critical law/ordinance governing Brown's job.[4]  In general, these regulations require employees like Brown to use the County's purchase system only to purchase goods for County purposes, and forbid employees from using the County's purchase system to make personal purchases.   The regulations also provide that false or unauthorized transactions using the County's purchasing system are grounds for discipline including discharge from employment. (Lawson Decl. ¶6).

In particular, the purchasing policies informed Brown that the "purpose of a valid Purchase Order is to serve as authorization for a County representative to enter into a transaction for goods and services on behalf of the County Commission."  Policy GPP-8 states "Buyers are to process only properly approved requisitions" and further states "buyers are the only personnel authorized to enter into transactions for goods and services on behalf of Mobile County."  Policy GPP-4 states a "Purchase Order is required any time permission for the purchase of a good or service has not already been established through another Commission-approved method."  Policy GPP-2 provides that "personnel ... who initiate an unauthorized transaction may be terminated or subject to some other disciplinary action".   Policy GPP-13 similarly states the "designated responsible employee must authenticate all goods … received.   Personnel … who falsely authenticate receiving goods … for the benefit of the County … may be terminated or subject to some other disciplinary action". (Lawson Decl. Exhibit 2).

**C.**    **Investigation of Plaintiff's Misconduct**

---

[4] (Lawson Decl. Exhibit 2).

The events leading to Brown's discharge began with a report on November 6, 2013, from Robert Howell, a parts runner for the Public Works Department.  On that day, Howell reported that he went on a parts run for another buyer to a vendor named Clutch & Powertrain. Clutch & Powertrain employee Lee Mullin gave Howell two axels, seals and bearings to deliver to Brown. When Howell returned to Camp 1, he put the seals and bearings on Brown's desk and gave her the receipt from Clutch & Powertrain. At Brown's request, Howell put the axels in her personal vehicle in the Camp 1 parking lot. (Lawson Decl. ¶9).

Howell apparently felt uneasy about this transaction and reported the matter to his supervisor. Howell was directed to prepare a written statement5 and to contact Clutch & Powertrain to request the vendor to fax over a copy of the invoice.[6] (Lawson Decl. ¶9).  Howell's statement recites:

> While out making my morning parts runs one of the parts buyers Eddie Rome called me on the county radio about 10: AM and ask me if I could run by Clutch Products and pick up a clutch that was ready. While I was their Lee, a salesman ask me to take some parts to Karen Brown the other parts buyer. I ask if there was a purchase order number on the ticket Lee said it was, so I loaded the clutch, axles, bearings and seals in the county pickup and returned to the shop. When I went in to the parts room I ask Karen where she wanted the parts she said that for me to put them in her car, so I put the axles in her car and gave her the rest. I thought about it and went and talk to the Supervisor Keith Weed and he called Robert Gordon Equipment Service Manager, Keith told me that Robert told him to put the paper work in an envelope and for me to bring it to him and I did.

(Lawson Decl. Exhibit 7).

It was the understanding of Brown's superiors at the time that Brown owned a 2003 Ford Crown Victoria. The parts retrieved by Howell and placed on Brown's desk and in her car were for a Ford Crown Victoria / Grand Marquis.   This type of vehicle is not used by the Public

---

[5] (Lawson Decl. *Exhibit 7*) (copy of Howell's statement)

[6] (Lawson Decl. Exhibit 9) (a copy of Clutch & Powertrain invoice 392235 dated 11/6/2013 (time stamp 10:43 a.m. signed by Howell)

Works Department at Camp 1 and is not one for which Brown purchases parts. The Clutch & Powertrain invoice reflects the purchase of two axels at a price of $125.00 apiece, and associated seals and bearings with a total non-taxable price of $285.68. No tax would be due on the transaction if the County were the actual customer. (Lawson Decl. ¶10).

After learning about these events, Brown's supervisor Fletcher Robinson wrote to Superintendent Lawson stating his belief Brown had violated policy and should be disciplined.[7] They proceeded to investigate the matter further. (Lawson Decl. ¶9).

The Clutch & Powertrain invoice referenced a County Purchase Order P195581. Subsequent investigation revealed Brown had created Purchase Order 195581 addressed to Clutch & Powertrain for two PTO gears at a cost of $125.00 each.[8] These PTO gears are used in a rotary cutter gear box and are actually sold for $225.00 apiece. (Lawson Decl. ¶10).

Terry McCawley, a Clutch & Powertrain sales representative, provided a written statement during the investigation.[9] (Lawson Decl. ¶11). The statement recited:

> On Wednesday, November 6, 2013 at about 6:30 A.M., I received a call on my cell phone from Karen (Purchasing Agent). She said that she needed two axles for a Crown Vic and wanted to know if I carried them. I told her that I did.
>
> I was curious to the fact that she would be buying Crown Vic parts so I asked her if they were for a cruiser. She said, "Yes." I assumed that one of the cruisers must have broken down near camp one.
>
> She asked me if I would call her with a price when I got to work. I said I would. At work I made a quote ticket and called Karen with a price. She thanked me and said that she would call me back with a purchase order number. Shortly after talking with her I had to leave town.

---

[7] (Lawson Decl. Exhibit 6) (Robinson's 11/6/2013 letter to Lawson)

[8] Lawson Decl. Exhibit 12) (a copy of the "Clutch & Powertrain" "PTO" Purchase Order 195581)

[9] (Lawson Decl. Exhibit 8) (copy of McCawley's statement)

> Later that morning our salesman, Lee Mullen, received purchase order Number P195581 for the two axles, bearings and seals.

(Lawson Decl. Exhibit 8).

Lawson concluded that Howell's unexpected delivery of the axels and other parts directly to Brown at Camp 1 appeared to have alerted Brown to the fact that her use of a County purchase order for personal use might be discovered. Subsequent investigation revealed the following efforts appeared to have been made to cover her tracks. (Lawson Decl. ¶11).

First, at 12:01 p.m., about an hour after Howell brought the axles and other parts for Brown's car to Camp 1, Clutch & Powertrain  generated a credit for the items showing the County would not be charged.[10]   Clutch & Powertrain's records show Brown's husband, James, paid for those items just two minutes later, at 12:03 p.m.[11]   Second, Brown generated a new purchase order using the same P195581 number as on the Clutch & Powertrain purchase order. This order was addressed to Hillman Oil Company for a $31.22 tension gear.[12]   But Hillman Oil's invoice for the tension gear, dated November 7, 2013 and signed by Brown, indicates the original purchase order used in communicating with the vendor was P195582.[13] (Lawson Decl. ¶¶12-13).

Further investigation revealed that, on November 7, 2013, Brown created purchase order P195653 to O'Reilly Automotive  Stores to buy sealant, pag oil, spark plugs, and ten wheel

---

[10] A copy of Clutch & Powertrain charge credit 392240 dated 11/6/2013 (time stamp 12:01 p.m.) is enclosed as Exhibit 10.

[11] (Lawson Decl. Exhibit 11) (copy of Clutch & Powertrain invoice 392241 dated 11/6/2013 (time stamp 12:03 p.m., signed by James Brown)

[12] (Lawson Decl. Exhibit 13) (copy of the "Hillman Oil" "tension gear"  purchase order)

[13] (Lawson Decl. Exhibit 14) (copy of the Hillman Oil invoice dated November 7, 2013 signed by Brown)

studs.[14]   These wheel studs fit a Ford Crown Victoria / Grand Marquis. The wheel studs and other items were delivered to Camp 1 and signed for by Brown at the end of the work day on November 7, 2013.[15]  Brown should not have signed for and accepted the wheel studs if they had been delivered in error. (Lawson Decl. ¶14).

During the investigation, Lawson learned that, over the weekend of November 9-10, 2013 an off-duty County employee installed the axels on Brown's 2003 Crown Victoria. he also learned that, on November 12, 2013, Brown returned the wheel studs to O'Reilly for a credit to the County.[16]   Brown later generated an amended purchase order P195653 deleting the studs.[17] (Lawson Decl. ¶15).

## D.   <u>Civil Service Protections For Plaintiff's Job</u>

Brown was a civil service employee with various job protections created by Alabama Local Act No. 470. This local act also created an independent entity, the Mobile County Personnel Board, to supervise and administer the civil service system. The Personnel Board has enacted rules and regulations governing the conduct of civil service employees and employers within its jurisdiction.[18]  Personnel Board Rule 14.2 provides that a civil service employee may be dismissed for "cause." Rule 14.2(l) defines "cause" for dismissal as including "violation of any lawful or reasonable regulation or order made and given by a superior officer."   Section

---

[14]  (Lawson Decl. Exhibit 15) (copy of the original purchase order 195653)

[15]  (Lawson Decl. Exhibit 17) (copy of the 11/7/2013 invoice (time stamp 17:00.17) referencing Purchase Order P195653 and listing the ten wheel studs signed by Brown)

[16]  (Lawson Decl. Exhibit 18) (copy of the 11/12/2013 return receipt (time stamp 9:25:35))

[17]  (Lawson Decl. Exhibit 16) (copy of the amended purchase order P195653)

[18]  Local Act 470 and the "Rules and Regulations" as revised through April 16, 2013 are available online  at<http://www.personnelboard.org/Laws_Rules.html>.

22(a) of Local Act 470 provides for civil service employees like Brown to appeal a discharge to the Personnel Board.[19]   Under Sections 24 and 29 of the Local Act 470, discharged employees have full procedural rights to contest a discharge because the Personnel Board has the authority to investigate, subpoena witnesses, conduct hearings, and compel sworn testimony concerning an employee's discharge.[20]

### E.   Termination of Plaintiff's Employment

At a pre-disciplinary hearing on November 15, 2013, Superintendent Lawson provided Brown an opportunity to respond to his conclusion that she had generated purchase orders for parts for her personal vehicle. Lawson also reminded Brown of a previous verbal reprimand for using a County purchase order for personal reasons. Brown denied any misconduct, blamed the Clutch & Powertrain employees for changing the purchase order and for erroneously having the parts delivered to her, and blamed O'Reilly for delivering wheel studs which she claimed she had only inquired about.  Lawson did not find Brown's story credible. (Lawson Decl. ¶16).

During the pre-disciplinary hearing, Brown also speculated to Lawson that she was being "persecuted" by Raymond Shelly who allegedly harbored "a desire to get rid of" her.  There are no facts to support her accusation because Shelly had nothing to do with the investigation outlined above or Lawson's recommendation of termination to Commissioner Ludgood and Director of Public Works / County Engineer Ruffer or their discharge decision. Lawson denies any allegation that Brown's race or sex was the reason for her discharge. (Lawson Decl. ¶17).

---

[19] Laws and Rules, p.17.

[20] Laws and Rules, pp.21, 23.

Commission President Merceria Ludgood (black female) and Director of Public Works /
County Engineer Joe Ruffer (white male) actually made the decision to discharge Brown based
on Lawson's recommendation following an investigation and a pre-disciplinary hearing with
Brown on November 15, 2013.  (Lawson Decl. ¶7).  As stated in a letter to the Mobile County
Personnel Board dated November 22, 2013 written by Lawson and approved by Ludgood and
Ruffer,[21]  Brown's superiors "believe[d] that in … two purchases made on November 6, 2013,
and November 7, 2013, you [Brown] created Mobile County purchase orders to vendors for
items that you [Brown] needed for your [Brown's] own personal use."

Brown appealed her termination to the Personnel Board.[22]  The Personnel Board held a
trial on February 18, 2014. Brown was represented by a very experienced employment attorney
who had an opportunity to cross-examine Lawson and other County witnesses.  Brown, her
husband, and a co-worker witness she called also had an opportunity to testify. The Personnel
Board did not believe Brown's story and upheld the termination by written order dated February
25, 2014.[23] (Lawson Decl. ¶8).  In particular, the Personnel Board found as follows:

> The Board finds by a preponderance of the evidence that the Appointing Authority
> sustained its burden of proving that the employee violated Mobile County Personnel
> Board Rule 14.2(1), violation of any reasonable regulation or order made and given, by
> using a county purchase order number to obtain parts for her personal vehicle.
>
> The Personnel Board has carefully considered the memory, narration and perception of
> the witnesses and their demeanor as well as all of the exhibits introduced in evidence.
> The Board credits the testimony of Terry McCawley that Ms. Brown inquired about the
> availability of axels for a Crown Victoria, told McCawley that the parts were needed by
> her employer to repair a cruiser, and told him she would send the vendor a county
> purchase order for the axels. ***The Board rejects the testimony of Ms. Brown that the
> vendor somehow mistakenly associated the axels she sought to buy for her personal***

---

[21] (Lawson Decl. Exhibit 3) Brown also attached a copy of this letter to her complaint. [Doc.4 pages 68-69]

[22] (Lawson Decl. Exhibit 4) (copy of Brown's 12/2/2013 appeal notice)
[23] (Lawson Decl. Exhibit 5) (copy of the Personnel Board's 2/25/2014 order)

**vehicle with County purchase order number 195581 for two PTO gears. The Board finds Ms. Brown's explanation of the reason she prepared the purchase order for the PTO gears unconvincing at best.** The Board is cognizant of the fact that the County did not incur any expense as a result of her misuse of the purchase order number, but Ms. Brown should not have misused the purchase order number in the first place.

(Lawson Decl. Exhibit 5) (emphasis added).

**F.    No Disparate Treatment of Eddie Rome (White Male Auto Parts Buyer)**

In a charge of discrimination Brown filed with the Equal Employment Opportunity Commission after her discharge, she accused Lawson of treating her differently than another Auto Parts Buyer named Eddie Rome.[24]   In particular, she contended: "In April 2013, Eddie Rome (White, Auto Parts Buyer) purchased $5,000-$7,0000  [sic] worth of cleaning supplies from  a vendor  in exchange  for staying  at the vendor's beach property  in Gulf Shores,  AL. Lawson suspended Rome for 10 days and did not terminate his employment." [Doc.4 page 20].

Rome was suspended for 10 days in 2013 for staying in a vendor employee's beach house without paying rent. But Brown's accusation that Rome "purchased $5,000-$7,0000 [sic] worth of cleaning supplies from a vendor in exchange for staying at the vendor's beach property" is wholly false.  Zep, Inc. has been a regular vendor for the County for more than a quarter-century, and Rome had no authority to "steer away" business from Zep had he been "denied" the use of the beach property.  Lawson never saw any evidence that there was no "exchange" promised or made between Rome and Zep's employee. (Lawson Decl. ¶18).

Rome was interviewed on July 10, 2013 concerning his stay at the beach house owned by Zep's employee, Larry Miller. Rome freely admitted he did so without paying rent.  But he

---

[24] Brown attached this charge to her complaint. [Doc.4 page 20]

12

answered "no" when asked "were there any promises or deals made to pay for the stay at the Bay house?"[25] Lawson never received any information to contradict this denial. (Lawson Decl. ¶19).

Commissioner Ludgood and Director of Public Works / County Engineer Ruffer actually made the decision to suspend Rome based on Lawson's recommendation. (Lawson Decl. ¶19). In a letter to the Personnel Board dated August 1, 2013 approved by Ludgood and Ruffer,[26] Lawson summarized the reasons for his suspension recommendation as follows:

> On Monday, July 22, 2013, a pre-disciplinary hearing was held on Mr. Eddie Rome, Auto Parks Buyer in Department 96, for violation of Mobile County Personnel Board Rule 14.2 (1) violation of any lawful or reasonable regulations or order made and given by a superior officer. In violation of the Alabama Ethics Law, he accepted benefits offered to him by a vendor.
>
> At this hearing, Mr. Rome told us that one day in April, Mr. Larry Miller, a salesman for Zep products, was in the shop and mentioned that his family had a vacation house on Mobile Bay at Mullett Point. Mr. Rome told him that he was looking for a place to take his family for spring break and asked Mr. Miller if he rented it. Mr. Miller told him that he didn't rent it, but the place was unoccupied most of the year and that when someone wanted to use it, he would let them. Mr. Miller told the group of people that it needed to be used, because if no one used it, things would break and it was his responsibility to keep it maintained.
>
> At some time later in April, Mr. Rome contacted Mr. Miller and asked him if he could use his house. Mr. Miller told that that he was welcome to use it. Mr. Rome stayed at the house for approximately one week for spring break.
>
> In July, I was made aware of this and questioned Mr. Rome. He told me that he had stayed at Mr. Miller's house. I told him that I would need to hold a pre- disciplinary hearing on this because he had violated the Alabama Ethics Law by accepting something of value from a vendor.

 (Lawson Decl. Exhibit 20).

In Lawson's opinion, having investigated both Brown and Rome, their actions were not comparable. Brown misused the purchase order system for personal gain in violation of multiple

---

[25] (Lawson Decl. Exhibit 19) (copy of the transcript of the interview)

[26] (Lawson Decl. Exhibit 20)

purchasing policies and did so even after a previous warning for similar conduct. Brown attempted to cover up her misconduct and lied about it when she was caught. Rome offered to rent the beach house, but the owner told him that rent was not necessary and that Rome could use the beach house without any payment. Rome had not been previously warned about similar misconduct, did not misuse any County procedures, did not attempt to cover up anything, and did not lie about his conduct when it was discovered.  Lawson believed a suspension and $300 rental payment was the appropriate discipline instead of termination which was why that was Lawson's recommendation.   Lawson denies any claim that this level of discipline was imposed because Rome is white or a man or that he would have been fired based on these facts had he been black or a woman like Brown. (Lawson Decl. ¶20).

## G.  <u>No Retaliation for Plaintiff's October 2011 Grievance</u>

Also in the EEOC charge of discrimination Brown filed after her termination, she asserted "I believe I was discriminated against … in retaliation for filing a grievance in December 2011." [Doc.4 page 20].  Brown's beliefs are unsupported by fact. The County is not aware of a grievance Brown filed in December 2011, but is aware of a grievance she filed on October 20, 2011, which was finally resolved on December 16, 2011.[27]  (Lawson Decl ¶21). Brown's grievance accused Garage Supervisor Shelly as follows:

> On October 13, 2011 there was an attack on me by Mr. Raymond Shelley. He became raged about and order that came in. This order was for one of the outside, Camp 2. As we were unloading the order he (Mr. Raymond Shelley stormed into the parts room cursing about the order. I handed him the form to which was camp 2. He continued cursing and swearing which this happens very often. Mr. Fletcher Robinson (my Boss), Mr. David (the outside vendor) of Quality Electric, Mr. Eddie Rome (parts buyer) and Mr. Julius Yancey were present.  Mr.  Shelley threaten my position, He said that Mr. Robert Gordon gave him these orders. That all approval should come to him for his approval. He

---

[27] (Lawson Decl Exhibit 21) (copy of the 10/20/2011 grievance); (Lawson Decl. Exhibit 22) (copy of the "Step 2" grievance committee ruling dated December 14, 2011); (Lawson Decl. Exhibit 23) (copy of Lawson's letter to the Personnel Board dated December 16, 2011 recommending discipline)

> stated that when the layoff come he only going to have one buyer and that he did not give
> a damn who approves or disapprove. He was cursing in a bad way. This action was very
> unprofessional and should not be part of the workplace. According to the Law of Human
> Right of 1964 no persons should be harassed and cursed as part of any workplace.

(Lawson Decl Exhibit 21) (typographic errors in original).

During the grievance process, Shelly admitted he raised his voice because he was upset about an order Brown had placed for a case of graffiti remover for Camp 2 without his approval. He stated that his remarks were not directed at any one person. He apologized to Brown and promised not to lose his temper again. Following the grievance process, Shelly was reprimanded and required to take a three-day supervisory and management anger management class provided by the Personnel Board. (Lawson Decl. ¶21).

Shelly had nothing to do with the investigation of Brown's November 2013 misconduct, did not recommend her termination, and did not make the decision to terminate her.  Brown's grievance in 2011 had nothing at all to do with Lawson's 2013 investigation and recommendation for her to be discharged. (Lawson Decl. ¶21).

## III.   Summary Judgment Standard

 "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (Dec. 2010).  Rule 56(c) provides as follows:

> ***(1) Supporting Factual Positions.*** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
>   **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
>   **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible

15

evidence to support the fact.

> **(2) Objection That a Fact Is Not Supported by Admissible Evidence.** A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

> **(3) Materials Not Cited.** The court need consider only the cited materials, but it may consider other materials in the record.

> **(4) Affidavits or Declarations.** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED.R.CIV.P. Rule 56(c) (Dec. 2010).  The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment.  Celotex, 477 U.S. at 323.  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992) (internal citations and quotations omitted).

## IV.   Conclusions of Law

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against employees on the basis of race and sex and from retaliating against employees for protected

16

activities, such as complaining about race or sex discrimination. 42 U.S.C. §2000e-2(a)(1).

Absent direct evidence[28] of discrimination or retaliation, a plaintiff may establish a discrimination or retaliation claim by circumstantial evidence using the three-step burden shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 1824-25 (1973).   Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004); Chapman v. AI Transp., 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc). In this case, Brown at all times bears the burden of producing sufficient evidence to show that her race, sex, or alleged protected activity "actually played a role in [the employer's decision-making] process and had a determinative influence on the outcome." Reeves, v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S. Ct. 2097, 2105 (2000) (quoting Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993)).   Brown's pro se status does "not absolve[ her] of [her] duty to provide the court with specific facts showing that there is a genuine issue for trial." Owens v. Lighthouse Counseling Center, Inc., 2009 WL 1204359 *7 (M.D. Ala. 2009) (DeMent, Sr. J., adopting recommended opinion of Coody, Magistrate J.) (citing Brown v. Crawford, 906 F.2d 667, 670 (11th Cir.1990).

> [A plaintiff's] own unsubstantiated opinion that the termination decision was somehow motivated by race is not an appropriate proxy for evidence. ... [S]elf- serving rhetoric, with no attendant facts, is simply insufficient to defeat summary judgment. ... "[U]nsubstantiated assertions alone are not enough to withstand a motion for summary judgment."

Id. (quoting Rollins v. TechSouth, Inc., 833 F.2d 1525, 1529 (11th Cir.1987).

---

[28] "The Eleventh Circuit has severely limited the type of language constituting direct evidence of discrimination." Patterson-Rudolph v. Jackson Hosp. & Clinic, Inc., 2009 WL 2738272 *5 n.6 (M.D. Ala. 2009) (Thompson, J., adopting recommended opinion of Coody, Magistrate J.). "Direct evidence of employment discrimination consists of statements by a person with control over the employment decision sufficient to prove discrimination without inference or presumption." Id. (internal quotation marks and citation deleted).

**A.    Brown Cannot Establish a Prima Facie Case of Retaliation.**

In Univ. of Texas Sw. Med. Ctr. v. Nassar, 2013 WL 3155234, *14 (June 24, 2013), the Supreme Court held: "Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e–2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."    To establish a prima facie circumstantial case of retaliation under Title VII, "a plaintiff must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two events." Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000) (quotations omitted). Brown fails to make a prima facie case of retaliation for lack of two of the three elements.

Despite the vague reference to "the Law of Human Right of 1964," nothing in the grievance or subsequent grievance proceedings indicated Brown truly believed at the time Shelly was cursing her or threatening her simply because she was black or a woman or both – she just mistakenly believes the law imposes a general civility code in the workplace. Accordingly, Brown's October 2011 grievance is not "protected activity" under Title VII.

Moreover, there is no evidence whatsoever to link Brown's October 2011 grievance to Brown's November 2013 termination.  The two-year passage of time[29] between the grievance

---

[29] The Eleventh Circuit has found that "in the absence of any other evidence of causation, a three and one-half month proximity between a protected activity and an adverse employment action is insufficient to create a jury issue on causation." Drago v. Jenne, 453 F.3d 1301, 1308 (11th Cir. 2006); see also Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007) (three to four month period between the protected activity is not "very close" temporal proximity); Higdon, 393 F.3d at 1221 ("By itself, the three month period … does not allow a reasonable inference of a causal relation between the protected expression and the adverse action."); Maniccia v. Brown, 171 F.3d 1364, 1370 (11th Cir. 1999) (citing Conner v. Schnuck Markets, Inc., 121 F.3d 1390, 1395 (10th Cir. 1997) (4-month lag between protected activity and termination not sufficient to justify an inference of causation)).

and the termination indicates there is no connection between the two. And it is undisputed that Shelly had nothing to do with the investigation of Brown's November 2013 misconduct, did not recommend her termination, and did not make the decision to terminate her.

## B.     Brown Cannot Establish a Prima Facie Case of Race or Sex Discrimination.

"[W]hen an employee alleges that his discharge resulted from the employer's alleged racial [or sexual] animus in disciplining employees for violations of work rules … [to establish a prima facie case, the] employee must show the following: (1) that he is a member of a protected class; (2) that he was qualified for the job; (3) that he suffered an adverse employment action; (4) that he 'has engaged - either (a) disputedly or (b) admittedly - in misconduct similar to persons outside the protected class'; and (5) 'that similarly situated, nonminority employees (that is, persons outside the protected class) received more favorable treatment.'" Smith v. Hyundai Motor Mfg. Alabama, LLC, 2008 WL 1698207 *6 (M.D. Ala. 2008) (DeMent, Sr. J.) (quoting Jones v. Bessemer Carraway Medical Ctr., 137 F.3d 1306, 1311 n.6 (11th   Cir.), modified on reh'g by 151 F.3d 1321 (11th Cir. 1998)).[30]    Brown meets the first three elements, but cannot satisfy the fourth or fifth element.

Brown cannot establish a prima facie case simply by denying that she violated the County's purchasing policies.   Instead, as the Eleventh Circuit held in Jones v. Bessemer Carraway Medical Ctr., she must show that similarly situated white or male employees, who also were charged with and who also denied violating the purchasing policies, were treated more favorably than she was:

> [N]o plaintiff can make out a prima facie case by showing just that she belongs to a protected class and that she did not violate her employer's work rule.   The plaintiff must

---

[30] The Eleventh Circuit modified an unrelated part of this opinion (relating to "direct" evidence) on rehearing, but reaffirmed its original holding that the plaintiff had failed to show a prima facie case. 151 F.3d  at 1322-1324.

> point to someone similarly situated (but outside the protected class) who disputed a
> violation of the work rule and who was, in fact, treated better.

137 F.3d at 1311 n.6.   And in conducting the comparator  analysis, this Court must remain

mindful that anti-discrimination law "does not take away an employer's right to interpret its rules

as it chooses, and to make determinations as it sees fit under those rules."   Silvera v. Orange

County Sch. Bd., 244 F.3d 1253, 1259 (11th  Cir. 2001) (internal quotations omitted). For this

reason, the employer's perception as to the severity of the employee's conduct is relevant in

determining  whether  the employee  and  the comparator  are similarly situated  in all  relevant

respects. See Nix v. WLCY Radio/Rahall Comm., 738 F.2d 1181, 1186 (11th  Cir. 1984)

(explaining if an employer applies a rule differently to people it believes are differently situated,

no discriminatory intent has been shown).

Brown cannot establish a prima facie case of race or sex discrimination by claiming

disparate treatment of her white male co-worker, Eddie Rome.  Such an attempted comparison

would fail the rigorous comparator analysis applied by this Court: "'We require that the quantity

and quality of the comparator's misconduct be nearly identical to prevent courts from second-

guessing employers' reasonable decisions and confusing apples with oranges.'" Frith v. Baldwin

Cnty. Comm'n, CIV.A. 07-0727-CG-B, 2009 WL 921062 (S.D. Ala. Mar. 31, 2009) (quoting

Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir.1999)).  In the County's reasonable view,

Brown's and Rome's actions were not comparable. Brown misused the purchase order system

for personal gain in violation of multiple purchasing policies and did so even after a previous

warning for similar conduct. Brown attempted to cover up her misconduct and lied about it when

she was caught.[31]  Rome offered to rent the beach house, but the owner told him that rent was not necessary and that Rome could use the beach house without any payment. Rome had not been previously warned about similar misconduct, did not misuse any County procedures, did not attempt to cover up anything, and did not lie about his conduct when it was discovered.

## C.    The County Had Legitimate, Non-Pretextual Reasons for the Discharge.

Under the McDonnell Douglas burden-shifting framework, if a plaintiff establishes a prima facie case of discrimination or retaliation, the defendant must "articulate" one more legitimate, non- discriminatory reasons for the challenged employment action. Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc).   The employer's burden in this regard is "exceedingly light." Turnes v. AmSouth Bank, N.A., 36 F.3d 1057, 1061 (11th Cir.1994).  "[T]the employer's burden is merely one of production; it 'need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'" Chapman, supra (quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254-55, 101 S.Ct. 1089, 1094 (1981)).

The County has met this burden by articulating the decision-makers' reasonable belief based on the investigation that Brown misled vendors, misused the purchasing system in a manner for which she had received prior warning, and attempted to cover up her misconduct. As a general proposition, an employee's failure to follow an employer's rules is a legitimate

---

[31] See Boyland v. Corr. Corp. of Am., 390 Fed. Appx. 973, 975-976 (11th  Cir. 2010) (In case where employer "proffered that it fired Boyland for violating a work policy [regarding security breaches] and lying during a subsequent internal investigation," evidence of other employees' security breaches was insufficient in part because there was "no evidence that any of the other employees who committed breaches lied in the course of the subsequent investigation.") (underlining added); Melton v. Nat'l Dairy LLC, 705 F. Supp. 2d 1303, 1319-1321 (M.D. Ala. 2010) (Moorer, Mag. J.) (A comparison between "Melton [who] was accused of lying ... [with] Brown [who] damaged equipment" was not sufficient – "The quantity and quality of the misconduct is not nearly identical as required. Rather, the misconduct is not similar at all.").

nondiscriminatory reason for a discharge. <u>Busby v. City of Orlando</u>, 931 F.2d 764, 777 (11th Cir. 1991). And the "employer's good faith belief" the employee violated the employer's rules, even if there was no rule violation in fact, is also a legitimate nondiscriminatory reason for a termination. <u>Clark v. Coats & Clark, Inc.</u>, 990 F.2d 1217, 1228 (11th Cir. 1992); <u>Jones v. Gerwens</u>, 874 F.2d 1534, 1540 (11th Cir. 1989) ("The law is clear that, even if a . . . claimant did not in fact commit the violation with which he is charged, an employer successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation."). <u>See also</u> <u>Perryman v. First United Methodist Church</u>, 2007 U.S.Dist. LEXIS 15513, 16-17 (M.D. Ala. Mar. 5, 2007) ("Disobeying the [employer]'s policy is doubtless a legitimate, nondiscriminatory reason to fire an employee."); <u>Sears v. PHP of Alabama, Inc.</u>, 2:05CV304-ID, 2006 WL 932044, *16 (M.D. Ala. Apr. 10, 2006) (where plaintiff contended she was retaliated against because she complained about sexual harassment on May 4 and was discharged on May 11, court ruled employer successfully showed an intervening legitimate reason for the discharge – her "involvement in [a] brawl which occurred at the group home [where she worked] on May 10").

Once the County meets its burden, any presumption of retaliation created by the prima facie case falls away, and the burden shifts back to Brown to show the reasons are merely pretexts for illegal retaliation and the real reason for her discharge was her alleged 2011 grievance. The employee must demonstrate that the stated reason is "'a pretext for discrimination'" by producing evidence "both that the reason was false, and that discrimination was the real reason." <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U. S. 502, 515, 113 S. Ct. 2742, 2752 (1993) (italics in original). "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee

cannot succeed by simply quarreling with the wisdom of that reason." Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000).

Brown's belief she did not commit misconduct is irrelevant for purposes of showing pretext. "The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs, and to be blunt about it, not on reality as it exists outside of the decision maker's head." Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1266 (11th Cir. 2010). In analyzing pretext issues, the court "must be careful not to allow … plaintiffs simply to litigate whether they are, in fact, good employees." Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2002).

The issue is not whether Brown "really was [at] fault …. The question is whether her employer [was] dissatisfied [due to] nondiscriminatory reasons, even if mistakenly or unfairly so". Alvarez, *supra*. Federal courts "do not sit as a super-personnel department that re-examines an entity's business decisions." Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991). "An employer may fire an employee for good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." Nix v. WLCY Radio/Rahall Comm., 738 F.2d 1181, 1186 (11th Cir. 1984). Asking a court to determine "whether a business decision is wise or nice or accurate … is precluded by [law]." Rojas, 285 F.3d at 1344. "The reasonableness of the decision maker's belief is not at issue in employment suits, and so, the question of whether an employer's honest belief has a basis in fact is not a proper question to be considered on summary judgment." Garcia-Cabrera v. Cohen, 81 F.Supp.2d 1272, 1282 (M.D. Ala. 2000) (Albritton, C.J.). Accord Silvera v. Orange County School Board, 244 F.3d 1253, 1261 (11th Cir. 2001) (An "employer who treats two employees differently because of a mistaken belief in the existence of a neutral reason does not violate Title VII."); Damon v. Fleming Supermarkets, 196 F.3d 1354, 1363 n.3 (11th Cir. 1999) ("An

23

employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct."); Smith v. Papp Clinic, P.A., 808 F.2d 1449, 1452-53 (11th Cir. 1987) ("[I]f the employer fired an employee because it honestly believed that the employee had violated a Company policy, even if it was mistaken in such belief, the termination is not 'because of race'".).

Brown cannot establish pretext by arguing the County did not lose any money or pay for anything which it did not actually purchase.  She was fired because her employer concluded she should not have been misusing the purchasing system in the first place, regardless of whether she got away with it. "Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules." Jones, 137 F.3d at 1311 (quoting Nix v. WLCY Radio/Rahall Comm., 738 F.2d 1181, 1187 (11th Cir.1984)). Accord Foster v. Mid State Land & Timber Co., Inc., 2007 WL 3287345 *13, *14 (M.D. Ala. 2007) (DeMent, Sr. J.) (A plaintiff "cannot survive summary judgment simply by proffering excuses for his conduct" and cannot "merely disagree[] with [the employer]'s application of the policy to his conduct".).

Brown cannot establish pretext by claiming the vendors and her co-workers lied about her during the investigation without further proof that the decision-makers knew her co-workers and the vendors were lying about her. When an employer has "contradictory accounts of historical events, the employer can lawfully make a choice between the conflicting versions - that is, to accept one as true and to reject one as fictitious - at least, as long as the choice is an honest choice." E.E.O.C. v. Total Sys. Servs., Inc., 221 F.3d 1171, 1176 (11th Cir. 2000).

Accordingly, the relevant question is whether the decision-makers did not honestly choose to believe the vendors and co-workers instead of Brown, as the Eleventh Circuit held in Elrod:

> Much of Elrod's proof at trial centered around whether Elrod was in fact guilty of the sexual harassment allegations leveled at him by his former co-workers. We can assume for purposes of this opinion that the complaining employees interviewed by Rives were lying through their teeth. The inquiry of the ADEA is limited to whether [the decision-makers] believed that Elrod was guilty of harassment, and if so, whether this belief was the reason behind Elrod's discharge.

939 F.2d at 1470 (emphasis added).  Accord Halford v. Westpoint Home, Inc., 2010 U.S. Dist. LEXIS 81762, 20 (M.D. Ala. Aug. 11, 2010) (Where the employer fired the plaintiff after two women accused him of sexual harassment, plaintiff "cannot carry this burden [of showing pretext] by simply asserting that [they] lied"); Batts v. Silver Line Bldg. Prods. Corp., 2010 U.S. Dist. LEXIS 22794, 42-43 (N.D. Ga. Feb. 22, 2010) (Scofield, Mag. J.) (Plaintiff's contention "the witnesses who alleged that Plaintiff refused to fix the machine lied during the course of the investigation" was not sufficient to show pretext.).

## V.    **Conclusion**

Brown cannot show a prima facie case of race or sex discrimination due to the lack of similarly-situated white or male co-workers who engaged in essentially identical misconduct but who were not discharged.  Brown cannot show a prima facie case of retaliation because her October 2011 grievance was not protected activity, and there is no causal link between that grievance and her discharge over two years later.  Brown also cannot establish that the County's articulated reasons for her discharge are false and a pretext for discrimination.  She merely seeks to substitute her judgment and personal opinions regarding this employment decision, which is

insufficient as a matter of law.  The County is entitled to summary judgment dismissing her termination claim with prejudice.

Accordingly, it is **ORDERED** that Defendant's Motion for Summary Judgment on Plaintiff's discriminatory/retaliatory termination claim (Docs. 12, 13, 17)  is  **GRANTED.**

**DONE** and **ORDERED** this the 6th day of **January 2015.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**